Pearl Sweet et al., Appellees, v. H. R. Bergen et al., Appellants.

No. 45331.

December 10, 1940.

Lee J. Farnsworth, for appellees.

Dutcher, Ries & Dutcher, for appellant.

RICHARDS, C. J.—Stated chronologically, the underlying factual matters in this case are these: In 1915 or 1916, plaintiff Caleb Sweet acquired from his father the life estate in question. Its duration was for the period of Caleb's life. He built upon the

40 acres a dwelling house. In 1921 plaintiffs Caleb and Pearl Sweet intermarried, and, together with the children born to them, have ever since lived together as members of one family. In 1923 this family went into occupancy of the 40 acres, and lived thereon, and in the aforementioned house as their home until 1929, in which year, under circumstances that will be narrated, the family removed to Lone Tree, a small town about three miles distant from the 40 acres. During the succeeding two years plaintiffs rented the land to others. In the record are two instruments bearing date March 12, 1931. The execution of them constituted a single transaction. One of the instruments, signed by plaintiffs, purported to quitclaim to one Musser the interests of plaintiffs in the 40 acres, the consideration stated therein being $1.00 and other considerations. The other instrument was an agreement pertaining to the quitclaim and was signed by Musser and plaintiffs. To these instruments later reference will be made. On February 11, 1933, one Buell recovered a justice of peace court judgment against plaintiffs Caleb and Pearl Sweet. On March 31, 1933, a transcript was filed in the Johnson district court. Of this judgment defendant Bergen is the assignee. On August 9, 1939, aforementioned Musser quitclaimed all interests in the 40 acres to plaintiff Caleb Sweet, who on the same date quitclaimed all interest to plaintiff Pearl Sweet. On January 3, 1940, a general execution issued upon the transcripted judgment and notice of levy upon the life estate in the 40 acres was served on plaintiffs. On January 26, 1940, plaintiffs commenced this action against appellant Bergen as assignee of the judgment, and against appellant Don McComas, the levying sheriff.

The unquestioned homestead character of the life estate in the 40-acre tract as late as the year 1929 is the common starting point of the arguments of both parties. From there the goal toward which appellants' argument is directed is the establishing of the proposition that this homestead character was extinguished when the levy was made. Appellees' argument is that this homestead character continued, and has at no time been lost to them. These respective contentions revolve about two conceded facts, first, the plaintiffs' execution of the quitclaim, and the contemporaneous agreement with Musser in 1931, and second, the fact that subse-

quent to some time in the year 1929 the appellees were not living upon the tract in question.

During the trial matters were shown by the parties that they deemed explanatory of and collateral to the two conceded facts mentioned immediately above. Plaintiffs' testimony clearly established a situation which briefly was this. While plaintiffs were living on the tract in question, and prior to 1929, misfortune overtook them, in that plaintiff Pearl Sweet suffered illnesses that were serious and prolonged. There was extended hospitalization, and attendance by private nurses. In addition the expense for services of physicians was considerable, approximating $1,500. To meet these necessities plaintiffs sold off, from time to time, their personal property though needed for operating the 40 acres, and exhausted an interest Pearl Sweet had in her mother's estate. In 1929 they had reached a point where there had been such depletion of their resources that the family was removed to Lone Tree, in order that Mrs. Sweet, in her illness, could be near her mother and at a place in town where she could have attendance by physicians at less of expense than at the country home on the 40 acres. But this move was no more than palliative. The need in 1931 for funds on account of the illness was the occasion for the transaction on March 12th of that year with Musser. Out of the transaction plaintiffs derived from Musser $900, and it was paid the doctors and hospital. In substance plaintiffs both testify that the leaving of the 40 acres was a temporary expedient, for the purpose only of meeting the emergency, and was so motivated, rather than by any intent that their home be elsewhere than on the 40 acres. They both testify they never intended to leave the farm permanently, and that it has always been their continuous intention to return. Appellants' answer is that, regardless of intentions or purposes on part of plaintiffs, they absolutely alienated the premises to Musser, thereby making any such purposes or intentions wholly ineffectual. But plaintiffs deny that there was an absolute alienation effected in the March 12, 1931, transaction. Whether it was that, or only a hypothecation of the title, requires further references to the record.

In argument upon that question it is stressed by defendants that plaintiffs in their testimony used certain words in referring in a general way to the 1931 and 1939 transactions with Musser.

Defendants point out that plaintiff Caleb Sweet stated that he had to *sell* the life lease to pay the bills, and that Mrs. Sweet states that they *bought back* the farm from Musser. But controlling importance may not fairly be attached to the fact that these laymen failed to use some more technical word instead of "sell", and did not say redeemed instead of "bought back." As a matter of fact the record shows Mrs. Sweet using the words "to redeem the place" when referring to paying $500 to Musser when he quitclaimed in 1939. We think more of real truth is discoverable in the more substantial and unequivocal things that are in the record.

We advert to the quitclaim to Musser and the agreement between him and plaintiffs, both executed March 12, 1931. Musser, called and examined by defendants concerning that transaction, stated that before entering thereinto he required a policy of insurance on the life of Caleb Sweet. He testified that he required this, because he wanted more security. The policy was accordingly procured as is stated in the agreement. Further recitals in that instrument are these: that Musser was paying $900 to the Sweets as well as "all costs and expenses in connection with said dealings as of this date," and the premium on the policy; that Musser will pay the 1930 taxes on the land; that the lease of the premises for 1931 has been assigned to Musser. The instrument then states:

"Now, THEREFORE, first party [Musser] agrees that he will keep an accurate account of the total amounts that he has invested in said property and will, up to the time hereinafter specified, pay the insurance policies [sic] on said insurance policy and it is agreed between the parties hereto that all amounts invested under the terms of this agreement and said dealings shall bear six per cent simple interest from the date of payment by the said first party, and that all income derived from said premises shall be credited from time to time when actually received.

"It is also agreed and understood that whenever the total amount invested and paid out by said first party with six per cent interest as above, shall have been paid back to him through the income of said premises, that said insurance policy will then be surrendered and released to the said Caleb Sweet and Pearle Sweet, his wife, and that the items of disbursement by said first party shall cover the original investment, together with taxes, the

life insurance premiums, and the actual reasonable cost of repair and insurance in connection with said real estate.

"It is also agreed and understood that in the event of the death of second party prior to the time that said life insurance policy is released, as above provided, that settlement from the proceeds of said insurance policy will be made on the foregoing basis, namely, that said first party shall receive the full amount of said life insurance and on the above basis of account shall be entitled to the full amount of his investment, as above provided, with six per cent simple interest, first deducting any rentals received, and any balance then remaining under the above conditions shall be accounted for and paid to the said second parties, their executors, administrators or assigns."

Appellants take the position that whenever the total amount invested and expended on the land by Musser, with 6 percent interest, might have been paid back to him through income from the premises, the only obligation the instrument imposed on Musser was to surrender the insurance to the Sweets. To sustain this proposition appellants say there is no provision to be found in the instrument for turning back the title. But whether a defeasance clause was written into the quitclaim deed or agreement is not the ultimate question. "A court'of equity does not look merely at the form of the thing, but if necessary will read into an instrument an implied defeasance clause." Klingensmith v. Klingensmith, 193 Iowa 350, 352, 185 N. W. 75, 76. In determining whether there be that necessity there will be taken into consideration the manner in which the contract has been treated by the parties, the value of the premises as compared with the consideration of the contract, previous negotiations and subsequent dealings, and in general any material facts, or circumstances surrounding the transaction, to the end that the true intent and purpose of the parties be found and carried out. Viewing-the showing made, it is true that defendants' witness Musser stated that in the 1931 transaction nothing was said about a loan nor about the Sweets having any right to the property back upon paying any amount of money. But he admits that from time to time during the period intervening between 1931 and 1939 both of the plaintiffs were treating with him with respect to the title being conveyed back to them. As a witness he disclaimed having

knowledge whether or not he was to make an accounting to the Sweets for the crops. Finally in 1939, borrowing the money from others, the Sweets paid Musser $500, whereupon he quit-claimed to plaintiff Caleb Sweet on August 9th of that year. Musser testified that he thought that the rentals he had received were used as a basis for computing the amount of $500, and that he didn't take any more than that much profit off of the land. Quite significantly he testified that one reason for his reconveyance was that the Sweets kept saying that he, Musser, was letting the place run down. He stated he told the Sweets he would not put up any more repairs, and that he got an agreement from the Sweets to that effect, and an agreement that he, Musser, was not to put a thing on the land after the deed of August 9, 1939. Musser also stated that in 1939 the fertility of the soil was 50 percent better than in 1931, and that the value of the land was greater in 1939 than in 1931. When asked to explain why, under these circumstances, he resold for $500 what he had bought for $900 he admitted that he didn't know as he could answer that question. He added, however, that he had been "kind of a nervous wreck for a while" and wanted to dispose of it.

In the admitted approaches made by the Sweets to Musser with respect to the title being transferred back to them the record is rather indefinite as to what was said, though it appears that upon one of these occasions, according to Mrs. Sweet's undenied testimony, Musser inquired whether the Sweets had the money to get the land back, and was answered in the negative. At that time the Sweets had attempted to borrow the money but without success. Something more specifically showing what was the understanding the parties had of the 1931 transaction appears in Musser's own reason why he reconveyed. This reason was this—the Sweets "kept saying I was letting the place run down and run down, and this and that." If this was a reason it must have been also a recognition that the complaint came from persons who had rights in the premises affected by the thing complained of. Otherwise Musser's actions were unexplainable, that is his procuring from the Sweets an agreement that he was not to put any more improvements on the place than what was there and satisfactory, and wasn't to put a thing on after the reconveyance on August 9, 1939.

In addition to the foregoing matters that indicate that the parties have treated the transaction of March 12, 1931, as reserving interests in the life estate in the Sweets, with the right to redeem, a circumstance that corroborates that view is the improbability of defendants' contention, i. e., that no defeasance was intended. For it is so unlikely as to be hardly believable that the intention of the parties was to vest in Musser an absolute title to the life estate for which he would eventually be paying nothing. As pointed out, defendants' contention is that the parties intended and agreed that after Musser had been fully reimbursed for all expenditures including the $900, and 6 percent interest, he was still to keep the life estate. Keeping it he would have something for which he had paid nothing. And the annual rental value of that something was approximately $400. That such was the thing the parties sought to accomplish is in itself difficult to believe. And it would appear that not even Musser had that conception of the transaction in 1931 because then he viewed the life estate *as security*. He states that *more security* than the land was demanded, and more security was furnished. Another circumstance is the transferring of a life estate having an annual rental of approximately $400, protected by a policy of insurance, for the sum of $500. This is difficult to harmonize with common experience, unless it be explained on the theory that Musser knew and recognized that the Sweets were entitled to the security when that for which it had been held was paid. Though it does not specifically appear in the instruments, the record leads to the conclusion that a defeasance of title and a right to redeem was in fact intended by the parties. That right plaintiffs exercised on August 9, 1939. In view of the whole record this appears to us to have been clearly and convincingly established. Defendants' contention that there was an absolute alienation lacks support aside from the instruments themselves. That plaintiffs have at all times intended to return to their homestead, and were continually attempting to accomplish their return, is clearly and convincingly established by evidence that is uncontradicted by testimony or weakened by circumstance, unless perchance it be the length of time that elapsed before they reacquired the title and right of possession. And as to the length of time, it is to be noted that this is not a case in which, during a long period, the home-

steaders could have returned at their pleasure. The fact is that the Sweets were attempting in various quarters to borrow the money required to make the redemption and could not return until a lender was finally found. Under such facts inferences militating against plaintiffs' intentions, based on the length of their absence, cannot reasonably or fairly be drawn. Upon the whole record we are of the opinion that the trial court rightly held that plaintiffs had not abandoned their homestead and that it had not been lost to them. The decree is affirmed.—Affirmed.

HAMILTON, SAGER, MILLER, MITCHELL, STIGER, BLISS, OLIVER, and HALE, JJ., concur.